P. A. THOMPSON, APPELLEE, V. FRED FOKEN ET AL., APPELLANTS.

FILED MARCH 19, 1908. No. 15,118.

1. Homestead, Conveyance of. A homestead in Nebraska cannot be aliened or incumbered except by a written instrument executed and acknowledged by both husband and wife, and that execution must be the conscious, voluntary act of each spouse.

2. Specific Performance: HOMESTEAD: EVIDENCE. Evidence in this case examined, and found to be insufficient to establish the execution of a contract by the wife or to support the decree of the district court.

APPEAL from the district court for Webster county: ED L. ADAMS, JUDGE. Reversed and dismissed.

Bernard McNeny, for appellants.

L. H. Blackledge and A. D. Ranney, contra.

ROOT, C.

Action for specific performance of an alleged contract for the sale and conveyance of defendants' homestead. Decree for plaintiff, and defendants appeal.

It seems that defendants are husband and wife, and have resided for 13 years upon the quarter section of land in controversy. The record does not disclose whether the legal title was in the husband or wife, although the wife testified the land was hers, and the husband said "the farm belongs not to me." Defendants owned no other land, and its homestead character is clearly established. The husband is a cripple, and desired to sell

the land and move to town, while the wife objected to parting with the home. Defendants are Germans, although they speak the English language. November 18, 1905, Fred Foken, the husband, met John C. Rose, who is in the employ of one Simpson, and told Rose, he, Foken, wanted to sell his farm. Whereupon Rose made out a memorandum in a little vest pocket-book, and the writing was signed by Foken, and is as follows: "Nov. 18th, 1905. I, Fred Foken, list my farm for sale, the N. E. ¼ sec. 3, Town 3, Range 10, Webster Co., Neb., for sale for $4,100, and will pay $150 commission if sold by R. A. Simpson. (Signed) Fred Foken. R. A. Simpson, by John C. Rose, Agent." Rose made a deal with plaintiff, and on the 20th of November appeared at the Foken farm with a written contract, wherein Foken and wife purported to agree to sell the farm to plaintiff for $3,950, and Thompson to purchase at said price; $50 to be paid down, $150 December 1, 1905; $800 March 1, 1906, and remainder to be paid March 1, 1911. As a result of the conference the writing was signed by Fred Foken, and the wife's name was first attached to the contract by Rose, and later signed thereto by the husband. Rose, who is a notary public, affixed an acknowledgment to the contract. The details of the transaction at the farm are not agreed to by those present. It seems to be admitted that defendants said they would not sell for $3,950, and that the husband insisted he must receive $4,000. Rose gave his personal note for $50 to make up the deficit. Rose says the defendants were satisfied, and that the wife specially directed her husband to sign her name to the contract after he himself had signed it. Both defendants most emphatically deny this statement, and say the wife absolutely refused to sign the contract. She says: "Q. Did they ask you to sign this contract? A. Yes, sir. Q. You didn't see it? A. No. Q. Did they ask you to sell the land? A. No. Q. What did they say to you? A. Nothing, but sign him. Q. They said for you to sign him? A. He asked me to sign him. Q. Who said that?

A. John Rose. Q. What did you tell him? A. I wouldn't do it. Q. You told him you wouldn't do it? A. Yes, sir." The husband said: "Q. Did you talk with your wife about selling it? A. Yes; but then she would not allow me. Q. Did you tell Rose that she would not allow you? A. Yes; I told Rose to talk with her, the place belongs not to me. I couldn't sell him. He got to ask her, and he would not do it and drove off. Q. What did your wife say to Rose about your signing her name to the agreement to sell the place? A. 'You can write so much as you want, but never I sign it,' and she went out the door. Q. Why did you sign her name if you knew she did not want you to? A. 'John,' he says to me, 'you write her name,' and he wrote her name first, and then he strike them." Rose says that the only difference between himself and the defendants was over the $50, for which he gave his note, and further: "Q. And you say Mr. Foken signed her name to the contract? A. Yes, sir. Q. And he signed at her request? A. Yes, sir; he signed at her request. Q. State what her language was. A. Well, she says, after he had signed both contracts, she stood right close to him, at the stove, and I asked her to sign. She says to him, calling him by name, she said, 'You sign my name to both contracts;' and he said, 'You had better sign yourself'; and she said, 'No; sign both of them; it will be all right.' Q. Did she say, 'Sign by mark'? A. No, sir. Q. You started to sign her name? A. Yes, sir; I started to, but I marked it out. Q. And then Mr. Foken signed it? A. Yes; Mr. Foken signed her name." George Harral, an insurance adjuster, accompanied Rose, and was called in to witness the contract, and he says that, when Mr. Rose asked Mrs. Foken to sign the contract, she said: "Why, Mr. Foken can sign it"— and motioned for her husband to sign, which he did. He says he does not understand the German language, and all the talk was in German except a few words, but he remembers the wife said in the English language: "You sign the contract." The contract, plaintiff's check for $50 and the Rose note were

taken by the wife to Blue Hill and placed in a bank for plaintiff within two days, and defendants have not received or used any of the consideration for the contract. Plaintiff has made timely tender in cash, note and mortgage of the deferred payments. A tenant testified Mrs. Foken told him not to nail boards on the barn as they would lose them, and "everything that wasn't nailed wouldn't go with the place." There is not a scintilla of evidence to show that the contracts were read over to the defendants. Rose said he told them he had sold their farm for $3,950 or $4,000, and $50, or $4,100 and $150 commission. He did not tell them that $2,850 of the purchase price would not be paid for a number of years and would bear but 6 per cent. interest; in fact, he appeared to be devoting his entire energies to securing defendants' names to the writing. The evidence establishes that $4,000 was the fair value of the land in November, 1905.

Section 4, ch. 36, Comp. St. 1905, entitled "Homesteads," is as follows: "The homestead of a married person cannot be conveyed or incumbered unless the instrument by which it is conveyed or incumbered is executed and acknowledged by both husband and wife." Section 681a of the code directs us to review the record and determine appeals in equity, and reach an independent conclusion as to what finding or findings are required under the pleadings and evidence, without reference to the conclusion reached in the district court. "Specific performance is not generally a legal right, but rests in the sound, legal, judicial discretion of the trial court." *Clarke v. Koenig*, 36 Neb. 572. The contract must be unambiguous. An unconscionable price, any circumstances of overreaching, misrepresentation, or suppression of the truth, will justify a court in refusing specific performance. *Friend v. Lamb*, 152 Pa. St. 529, 34 Am. St. Rep. 672. In the instant case the testimony is not so conclusive that the contract was executed and acknowledged by the wife as that in our judgment it should be enforced by a decree for

specific performance. In fact, we cannot say the preponderance of evidence is in favor of plaintiff on this issue. It is conceded the wife did not herself sign the contract. It is admitted the husband signed her name thereto. Rose says Mrs. Foken told her husband to sign for her. Both husband and wife deny this fact. Harral, who seems to be disinterested, does not say the wife told the husband to sign her name, but that he could sign "it"; whether the contract or her name is not plain. Harral could not understand the language spoken by the parties, except as they temporarily lapsed into the use of English, and it seems incredible that the wife should have spoken in that interview in Harral's presence only those four words in English that would tend to support Rose in his claim. Rose, it will be observed, first signed Mrs. Foken's name to the contract. He says he thought he heard her say "you" sign it, and started to do so, when it occurred to him the signature would not be legal. Fred Foken's statement that he signed his wife's name to the duplicate contracts at the request of Rose seems reasonable, and supported by a preponderance of the evidence. The words, "wife's name signed by husband at her request in the presence of above witnesses," are written on the margin of the contract that was filed for record, but they do not appear on the duplicate left at the Foken home, so they were clearly an afterthought. Whether added before or after the instrument was recorded the record does not disclose. The act of the husband in signing his wife's name to the contract at the request of John Rose would not bind any one, and it may be doubtful whether it would bind her homestead if signed in her presence and upon her verbal request. We do not overlook *McMurtry v. Brown,* 6 Neb. 368, cited by plaintiff. In that case we find a statement in the syllabus and opinion to the effect that, if a deed is signed by an agent in the principal's presence in the name and upon the request of the principal, it is the deed of the principal. The real question in that case was whether a wife might give a written

power of attorney to her husband so as to empower him thereby to execute mortgages and deeds in her name binding upon her and her estate, and that question was answered in the affirmative. The report does not disclose that a single one of the various instruments referred to in that case were signed by the husband in the wife's name with none other than verbal authority for the act; nor was the question of homestead involved in any of the transactions. It is held by respectable courts, and in opinions logically reasoned, that a conveyance of a homestead signed by the husband for himself and by the husband for his wife, acting under a power of attorney for her, is void, both as to husband and wife, as not being that necessary evidence of the active consent of each mind to the disestablishment of the home. *Keeline v. Clark,* 132 Ia. 360; *Wallace v. Travelers Ins. Co.,* 54 Kan. 442; *Minnesota Stoneware Co. v. McCrossen,* 110 Wis. 316; *Gagliardo v. Dumont,* 54 Cal. 496.

The homestead is a favorite of the law. It is intended as a home, not only for the husband and wife, but their children as well. It is the policy of the courts to frown upon all attempts to secure title thereto, except the vendee brings himself clearly within the letter of the law. *Bird v. Logan,* 35 Kan. 228; *Warden v. Reser,* 38 Kan. 86. This we do not believe plaintiff has done.

We therefore recommend that the judgment of the district court be reversed and plaintiff's petition be dismissed.

Fawcett and Calkins, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and the cause is dismissed.

REVERSED AND DISMISSED.